**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 22-cr-121 (TNM)** |
| **v.** | : | |
| | : | |
| **JARED PAUL CANTRELL,** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Jared Cantrell to 10 months of incarceration, 2 years of supervised release, a $36,000 fine, and $500 in restitution.

## I.    Introduction

Defendant Jared Cantrell, 39, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

Cantrell was found guilty in a bench trial of violating 18 U.S.C. § 1752(a)(1) (Count One); 18 U.S.C. § 1752(a)(1) (Count Two), and 40 U.S.C. § 5104(e)(2)(G) (Count Four). As explained

---

[1] Although the Statement of Offense in this matter reflects a sum of more than $1.4 million dollars for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a sentence of 10 months of incarceration is appropriate in this case because Jared Cantrell (1) reached the Capitol building after walking through torn scaffolding and past broken barriers; (2) spent 19 minutes on the Upper West Terrace watching the chaos unfold; (3) entered the Capitol building through an emergency exit door despite an alarm blaring; and (4) stayed in the Capitol for nearly 10 minutes (5) has a lengthy criminal history and (6) has shown no remorse.

The Court must also consider that Jared Cantrell's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Jared Cantrell's crime support a sentence of 10 months of incarceration in this case.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* Statement of Offense at 1–3.

*Defendant Jared Cantrell's Role in the January 6, 2021 Attack on the Capitol*

Jared Cantrell, Quentin Cantrell, and Eric Cantrell (all cousins, collectively "the Cantrells")[2] attended the Stop the Steal rally and then marched down Constitution Avenue toward the West Lawn. The Cantrells reached the West Plaza of the Capitol grounds and ascended to the Upper West Terrace through the Northwest scaffolding.  Throughout this memorandum, Eric Cantrell is circled in green, Quentin Cantrell is circled in yellow, and Jared Cantrell is circled in red.

---

[2] The government charged all three Cantrells together in this case, 22-CR-121 (TNM).  Eric Cantrell pleaded guilty 40 U.S.C. § 5104(e)(2)(G) and was sentenced to a term of three months' probation and 40 hours of community service on March 27, 2023.



*Image 1.  Exhibit 6a, screenshot from Exhibit 6 at 20:47.[3]*

At approximately 2:19 pm, the Cantrells exited the top of Northwest scaffolding and continued to ascend the stairs toward the Upper West Terrace.



---

[3] References are to Trial Exhibits unless otherwise specified.

*Image 2.  Exhibit 9a, screenshot from Exhibit 9 at 0:07.*

When the Cantrells reached the Upper West Terrace, they observed broken police barriers.

*See* Exhibit 10.



*Images 3 and 4.  Exhibits 10a and 10b, screenshots from Exhibit 10 at 0:15 and 0:30.*

The Cantrells spent approximately 19 minutes on the Upper West Terrace observing the

chaos unfold outside of the Capitol building and appeared to filming with their phones as the riot

was unfolding.



*Image 5.  Exhibit 11a, screenshot from Exhibit 11 at 0:25.*

The Cantrells moved south along the Upper West Terrace, past the broken police barriers seen in Image 4.  The Cantrells made their way to the Upper West Terrace door (the "UWT door") where a makeshift barricade had been erected by rioters between the UWT door and a line of police officers in riot gear positioned to the south of the UWT door.  The Cantrells then ascended the stairs toward the UWT door where they entered the Capitol building. *See* Exhibit 15.



*Images 6 and 7.  Exhibits 15a and 15b, screenshots from Exhibit 15 at 0:58 and 1:15.*

The Cantrells entered through the UWT door at 2:37 p.m. As they entered, a piercing alarm sounded and a USCP officer was telling the rioters they were not permitted to enter the Capitol building. *See* Exhibits 16, 18.



*Images 8 and 9.  Exhibits 16a and 18a, screenshots from Exhibits 16 at 0:18 and 18 at 17:43.*

Unlike his cousins who did not alter their appearance or attempt to hide their identity, Jared Cantrell covered his face with a mask and wore sunglasses while he was inside the Capitol.  On their way inside the building, the Cantrells passed boxes lining both sides of the hall.



*Images 10 and 11.  Exhibits 17a and 17b, screenshots from Exhibit 17 at 17:44 and 17:53.*



*Images 12 and 13.  Exhibits 18b and 18c, screenshots from Exhibit 18 at 17:59 and 18:13.*

The Cantrells did not go through security and there was no indication that anyone was permitted to enter the Capitol building that day.  To the contrary, alarms were blaring, there were

boxes stacked in the hallway near the door and the door was clearly marked "Emergency Exit Only."

At 2:39 p.m., while Jared Cantrell remained inside, Quentin Cantrell and Eric Cantrell returned through the same set of doors and left the Capitol building.



*Images 14 and 15.  Exhibits 18d and 17c, screenshots from Exhibits 18 at 19:31 and 17 at 19:36.*

Though his cousins left the Capitol, Jared Cantrell proceeded further in the Capitol and entered the Rotunda.



*Image 16.  Exhibit 204a, screenshot from Exhibits 204 18 at 3:45.*

While in the Rotunda, Jared Cantrell took several photographs of himself in front of different works of art and sculptures as he made his way around the Rotunda.



*Images 17 and 18.  Exhibits 533 and 534.*

After approximately 10 minutes in the Rotunda, Jared Cantrell made his way out the Rotunda Doors and onto the East Capitol Steps.



*Image 19.  Exhibit 206c, screenshot from Exhibit 206 at 2:35.*

Jared Cantrell eventually left the Capitol grounds and met up with his cousins for the drive

back to Indiana.

*Social Media Posts*

After the attack on the Capitol, Jared Cantrell used social media to celebrate his actions at

the Capitol. On January 6, 2021, when asked by a friend whether he was in the Capitol, he

responded, "Stormed it."  Demonstrating his pride in being part of the attack, he posted, "I was

one of the first 50 in" followed by, "Forceful entrance."  When asked by another individual if

common acquaintances had been in the Capitol, Jared Cantrell responded they had not and that

because they had not attacked the Capitol, they were "Not real patriots."

Later, on January 7, 2021, Jared Cantrell tried to minimize his actions at the Capitol by

writing to a friend on social media, "They were letting folks in and at no point was there any verbal

Indication from any authority to not go in. The door was open and I peeked in."  However, as the

evidence at trial exposed, officers were not letting people in and in fact there was an audible alarm

blaring at the door where he entered the Capitol.  The evidence also revealed that Jared Cantrell did much more than "peeked in" as he states.  He was in the Capitol for approximately 10 minutes, a much greater period of time than a mere "peek in."  Cantrell also shared through social media, "People scaling the capitol building was quite a sight to behold though."

On January 11, 2021, Jared Cantrell changed his profile picture on social media to one he had taken inside the Capitol showing his lack of remorse for his actions from January 6, 2021.

*The Charges*

On March 8, 2022, the United States charged Jared Cantrell by criminal complaint with violating 18 U.S.C. §§ 1752(a)(1) & (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) & (e)(2)(G). On March 10, 2022, law enforcement officers arrested him at his home in Indiana. On April 7, 2022, the United States charged Jared Cantrell by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) & (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) & (e)(2)(G). On April 4, 2023, Jared Cantrell was found guilty after a bench trial as to Count One, violation of 18 U.S.C. § 1752(a)(1); Count Two, violation of 18 U.S.C. § 1752(a)(1), and Count Four, violation of 40 U.S.C. § 5104(e)(2)(G).

### III.   Statutory Penalties

Jared Cantrell now faces sentencing on Count One, 18 U.S.C. § 1752(a)(1), which has a maximum of one year of imprisonment, one year of supervised release, and a fine of up to $100,000. Count Two, 18 U.S.C. § 1752(a)(1) which has maximum of one year imprisonment, one year of supervised release and a fine up of up to $100,000.  Count Four, 40 U.S.C. § 5104(e)(2)(G), which has a maximum 6 months of imprisonment and a fine of up to $5,000.

IV.     **The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Jared Cantrell's adjusted offense level under the Sentencing Guidelines as follows:

Base Offense Level (U.S.S.G. §2A2.4)                              10

Total Offense Level                                              10

*See* PSR at ¶¶ 33 - 41.

The U.S. Probation Office calculated Jared Cantrell's criminal history as a category II. PSR at ¶ 43. Accordingly, the U.S. Probation Office calculated Jared Cantrell's Guidelines imprisonment range at eight to fourteen months of imprisonment. PSR at ¶ 66.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

**V.      Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 10 months of incarceration, 2 years of supervised release, a $36,000 fine, and $500 in restitution.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Jared Cantrell's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Jared Cantrell, the absence of violent or destructive acts is not a mitigating factor. Had Jared Cantrell engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Jared Cantrell's case is his lack of remorse.  Jared Cantrell has shown no remorse for his actions from January 6 and has in fact celebrated his actions through social media posts and communications.  Additionally, although not a great length of time compared to some other rioters, Jared Cantrell spent approximately 10 minutes in the Capitol after having to reach the UWT by navigating through torn tarps and scaffolding and past broken barriers. After navigating the numerous obstacles to get to the UWT, Jared Cantrell then spent 19 minutes

on the UWT terrace watching the chaos unfold and if those indications were not enough to stop him, he then entered the Capitol through a door which had a blaring audible alarm and a sign which clearly stated, "Emergency Exit Only." Jared Cantrell then spent time in the Rotunda taking pictures of himself and didn't remove the sunglasses and mask hiding his face until he exited the Capitol.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 10 months' incarceration in this matter.

### B. The History and Characteristics of Jared Cantrell

Jared Cantrell's conduct on January 6 was not an aberration in an otherwise spotless record. To the contrary, he has a lengthy criminal history dating back to 2003. Although many of his prior convictions do not result in criminal history points, Jared Cantrell has at least 7 arrests and convictions, the most serious being a weapons violation for carrying a handgun without a license from 2020. PSR at ¶¶ 42 - 48. His arrests on various charges continued even after January 6, 2021. PSR at ¶ 57. Moreover, his criminal history shows that minor sentences of incarceration have not deterred him from continuing to engage in crimes.

Jared Cantrell's contempt for the legal process is further demonstrated by his unwillingness to participate in a presentence interview with U.S. Probation or provide financial information, (PSR at ¶¶ 53, 62). Given that Jared Cantrell is listed as the owner of a property worth over $600,000, the government agrees with Probation that a fine is appropriate in this case. PSR at ¶ 62.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Jared Cantrell's refusal to accept responsibility and complete lack of remorse for his actions on January 6 generates a significant need for deterrence.  Jared Cantrell was proud of his actions on January 6, as demonstrated most clearly by his bragging on social media. At the same time, he was aware what he did was wrong, as evidence by his repeated lies on social media about the details of his conduct. Yet he has never accepted responsibility for his actions, nor has he ever expressed remorse for his conduct, or for any of the victims of January 6.

In addition, Jared Cantrell's lengthy criminal history shows that January 6 was consistent with an overall pattern of disrespect for the law that is ongoing. A significant period of incarceration is warranted in order to deter Jared Cantrell from ever again breaking the law to further his political goals.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[4] This Court must sentence Jared Cantrell based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Jared Cantrell has been found guilty of Count One and Count Two of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) and 1752(a)(2).  These offenses are a Class A misdemeanor. 18 U.S.C. § 3559. Jared Cantrell was also found guilty of Count Four; parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).  In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).  After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity

of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

For example, in *United States v. Russell Alford*, 21-cr-263 (TSC) the defendant walked past repeated and obvious signs the Capitol building and grounds were restricted, entered the Capitol through a door that other rioters had broken open, celebrated his participation on social media and spread disinformation about the riot via social media just as Jared Cantrell.  Unlike Cantrell, Alford mocked the pain and trauma suffered by officers and demonstrated a lack of candor and honesty during his trial testimony.  However, both Alford and Cantrell have shown a lack of remorse for their actions and Cantrell's criminal history is significantly more than Alford who had no criminal history.  Judge Chutkan sentenced Alford to 12 months incarceration and 12 months supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Jared Cantrell was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[5]

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic

---

[5] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Cantrell to pay $500 in restitution for his convictions on Counts One and Two. This amount fairly reflects Jared Cantrell's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VI.     Restitution

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has

suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Jared Cantrell was convicted of a violation of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[6]

---

[6] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Cantrell to pay $500 in restitution for his convictions on Counts One and Two. This amount fairly reflects Cantrell's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, five hundred dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was convicted of only misdemeanors and not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 10 months of incarceration, 2 years of supervised release, a $36,000 fine, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Zachary Phillips*
Assistant United States Attorney
CO Bar No. 31251
Capitol Riot Detail
United States Attorney's Office, Detailee
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (720) 281-1611
Zachary.phillips@usdoj.gov

*/s/ Michael L. Jones*
MICHAEL L. JONES
DC Bar No. 1047027
Trial Attorney
Capitol Riot Detailee
601 D St. NW
Washington, DC 20530
(202) 252-7820
michael.jones@usdoj.gov